UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FRANK A. CARUSO,
        Plaintiff

v.                        3:00-CV-0924 (EBB)

SIEMENS BUSINESS COMMUNICATIONS, INC.,
        Defendant

## REMANDED RULING ON MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

On April 25, 2002, this Court granted Defendant's Motion for Summary Judgment, holding that Plaintiff was not a disabled person within the ADA or its state counterpart, CFEPA. Plaintiff appealed to the Second Circuit Court of Appeals only that portion of this Court's Ruling which found that Plaintiff was not disabled under CFEPA. On page 15 of this Court's Ruling it held that "Plaintiff has failed to demonstrate that his knee, back and ankle injuries were chronic as of [the date of the adverse business decision]" and "Plaintiff has presented no evidence that the injuries to his ankle, knee, or back were `chronic' injuries." On page 16, however, this Court next noted that "Plaintiff's contention that his back injury was chronic <u>and permanent</u> must also fail as a matter of law." (Emphasis added). On this same page, the Court used the term "permanent" on three separate occasions, which the Court of Appeals held was the incorrect standard for a disability under CFEPA. Accordingly, it

remanded that portion of the Court's Ruling to determine whether Plaintiff's injuries were indeed chronic and, therefore, he was disabled under CFEPA.

### STATEMENT OF FACTS

The Court sets forth only those facts necessary to an understanding of the issues raised in, and decision rendered on, this Remanded decision.

Siemens provides voice, data, and mobile communication networks, offering a wide range of products as well as service and support for the installation and maintenance of its products. Plaintiff worked for Siemens, or its predecessor company, from 1979 until his termination in 1997.

Initially hired as a MAC (moves, adds, changes) technician, Plaintiff was responsible for installing and wiring telephones and adding hardware and equipment. He later became a customer engineer assigned to Siemens' Connecticut branch. As such, he was responsible for servicing and repairing company equipment at customers' sites.

On January 15, 1997, Caruso tripped over some debris while working at a customer site and injured his ankle and knee. As a result of this accident, Plaintiff filed for Workers' Compensation benefits and missed approximately three weeks of work during the period between January 22, 1997 and March 15, 1997.

Caruso further testified that, by March 15, 1997, he had resumed his regular work schedule. He was able to perform the

functions of his job as a customer engineer without any accommodation, which included driving over a total of 120 miles a day to and from his assigned customer site, and was even working considerable overtime. Plaintiff further testified that he was able to carry on his usual daily activities of showering, walking, driving, standing, lifting, and caring for his children and himself. He also coached Little League.

At that time, Plaintiff's only restriction, per his physician, Dr. Duffy, was to avoid stair climbing.[1]/ Regardless of this restriction, Plaintiff continued to regularly climb two flights of stairs at his customer site.

In August, 1997, Siemens' Workers' Compensation carrier requested that Plaintiff take a functional capacity examination to determine the extent of his physical restrictions, if any. During the exam, which took place on September 10, 1997, Plaintiff injured his back. He had no prior back problems.

Over the next few weeks, Plaintiff missed a few days of work here and there, but still managed to work considerable overtime. In order to determine if Plaintiff had any further restrictions due to his back injury, on September 22, 1997, Siemens requested that Plaintiff submit a medical release from his physician.

On October 1, 1997, Plaintiff submitted a disposition slip

---

1/ Although Dr. Duffy indicated that Caruso needed knee surgery to repair a torn meniscus, Plaintiff put off the surgery until February, 1998, eleven months after his injury, three months following the decision to terminate him and two months following his actual termination. He testified that he did so to accommodate the vacation schedules of his co-workers.

3

from Dr. Duffy, clearing Plaintiff to return to work, but stating that he should not lift more than seventy-five pounds, bend or squat repetitively, or climb. Contrary to Plaintiff's claim in his Memorandum of Law, Dr. Duffy placed no driving instructions upon him. Further, the disposition slip referred to Caruso's back injury only as a "sprain."

Plaintiff returned to work on October 1, 1997. Throughout the month of October, Plaintiff consistently worked without incident or time off, and, as he testified, he worked in excess of fifteen hours a day "[a]lmost every day". Plaintiff's Depo. (10/9/01) at 58 L: 17-21 - 59 L: 2-7. He needed no accommodation to do his job. *Id*.

Plaintiff also claims in his Memorandum of Law that he suffered from an umbilical hernia which was aggravated by the functional capacity test and that his manager, Michael Cyr ("Cyr"), was aware of this in September. This claim is in contradistinction from his clear deposition testimony. There, he reported an acute flare-up of his hernia problem on November 3, 1997. "Prior to this day onward [sic], I don't know, for maybe three, four weeks, I kept getting that sensation in my belly button like somebody poked their finger there, someone [sic] bothering me off and on." *Plaintiff's Depo.* at 62 L: 12-21. Plaintiff failed to testify that he had ever discussed his umbilical hernia with his supervisor, Cyr, prior to Cyr's departure from Siemens in late September, 1997. In fact, when asked if he had requested help from Cyr in order to do his job,

4

Plaintiff testified "I asked him to keep the medical department out of my business at this point." Id. at 60: L 25 - 61: L 1-3.

Meanwhile, in early September, 1997, Garreth Hinsch ("Hinsch"), Plaintiff's Service Branch Manager, was advised by corporate headquarters that a reduction in force was necessary. Without being told how many people would be affected, or from what job category, Hinsch was directed to go through the process of stack ranking the employees in the Connecticut branch.

Within days, Hinsch met with all of the field managers in order to explain the process. These field managers were ultimately in charge of assessing their employees. Each field manager was instructed to rank his or her employees in three specified areas: criticality of employee skills, current contribution/competencies, and ability to learn and apply new skills.

The "critical skill" ranking was designed to measure the degree of "fit of each individual's background, training, and skills to the future requirements of the business." The "current competency" assessment was designed to reflect the employee's then current skill level, and was to be based on the individual's last performance appraisal. Finally, the ability to learn new skills factor was expected to measure an employee's flexibility and growth potential, i.e., the employee's ability to learn and apply new skills, perform a variety of different tasks, and adapt to rapid change. Each employee was to be assigned a rating on a scale from zero to twelve in each category for a total possible

score of thirty-six.

As Caruso's field manager in September, 1997, Cyr was charged with the task of evaluating Plaintiff, as well as thirteen other customer engineers, in the three designated categories. Cyr followed the directions in the Siemens Rebalancing Program documentation and produced a document, following his performance of each rating of his supervisees, entitled "Process of Identification Employees Matrix." *Cyr Affidavit*, 11/13/01 at ¶ 5. He completed the reviews on October 2, 1997. Cyr was familiar with these reviews, having performed them for earlier reductions in force, when he also followed the above-referenced corporate instructions and concomitant documents. *Id.* at ¶ 6.

Cyr used a Role Profile for the Customer Engineer position to guide him in assessing the criticality of Employee Skills of the customer engineers he was reviewing. He used a document entitled "Attributes for Success" is assessing the Ability to Learn and Apply New Skills. For the Current Competencies/ Contribution factor, he referred, as mandated, to the employees last performance review[2] and applied the numerical rating as a result of these documents. *Id.* at ¶¶ 10-12.

With respect to Plaintiff, Cyr based his assessment of his

---

[2]/ Plaintiff's last three performance reviews received an "M" rating, which simply means that he "meets expectations." The majority of the other customer employees received a rating of "C", which means "consistently exceeds expectations."

6

growth and flexibility on Cyr's personal experience with Caruso in their most recent assignment. Cyr found him to have problems accepting changes in the direction of the business in that he frequently made negative comments about such changes and persisted in doing things in ways that had been discontinued. In this category he assigned Caruso a 3, which is next to the lowest rating possible. Caruso was ranked 6, the third lowest category, in both Criticality of Skills and Competency of Performance. Cyr wrote, "moderate technical ability; does not deal well with ambiguity; little self motivation." Receiving a total score of just 15, Caruso was ranked second from the bottom of the fourteen individuals rated by Cyr. *Cyr Affidavit*, Exhibit B.

Commenting that Caruso had only moderate technical ability, did not deal well with ambiguity, and had little self-motivation, Cyr gave Caruso a rating of six in both criticality of skills and current competencies, and a rating of three in growth and flexibility.[3]/ Receiving a total of fifteen points, Caruso was ranked second to last out of the fourteen customer engineers

---

[3]/ With respect to the critical skills rating, Cyr observed that Siemens' business was changing from exclusively voice technology to combined voice and data technology, and he believed Plaintiff's experience and training were suited only for voice products and systems. Plaintiff admitted in his deposition that he did not keep up on training with newer technology. While Plaintiff's resume shows that he had completed seven training programs during the period from 1981 through 1998, during the nine-year period from 1989 through the date of Cyr's assessment in September, 1997, Plaintiff had completed just one training session. In that time period, Plaintiff's field managers had tried to schedule him for training on new products, but Caruso refused to attend. One of the field managers, Gary Bunce ("Bunce"), had actually scheduled Caruso for training on the new systems on two separate occasions, but Caruso cancelled out of them.

reporting to Cyr.

Because Cyr was scheduled to leave the employ of Siemens in early October, Hinsch directed him to meet with Human Resources to go over his performance ratings, which Cyr did on October 2, 1997. Cyr specifically discussed his low rating of Caruso. Shortly thereafter, Hinsch conducted a meeting with the remaining field managers to go over the ranking sheets. The purpose of this meeting was to serve as a check against the scores assigned by each particular field manager. During the meeting, the field managers discussed the ratings that had been given to each employee. Field managers who had significant experience with employees who were not working in their specific groups were given an opportunity to voice their opinion about the assigned scores. While the meeting lasted for several hours, no scores were changed.

Although he still did not know how many employees he had to separate, in preparation for a meeting at corporate headquarters, Hinsch made a list of the lowest ranking employees in the Connecticut branch by job category. On account of a combination of his ranking score and seniority date, Caruso was ranked as the fourth lowest customer engineer out of fourteen customer engineers.

Hinsch was told that he had to lay off four Connecticut branch employees. He decided on October 26, 1997, that, based upon the number of employees in each job category in relation to the needs of the Company, the lowest four ranked customer

8

engineers would be laid off. This group included Plaintiff. It was determined that the lay off of these individuals would take place on November 21, 1997.

After three to four weeks of minute symptoms (which never kept Plaintiff from coming to work or working excessive overtime), Plaintiff suffered a flare-up of an umbilical hernia on November 3, 1997, and on November 4, 1997, Plaintiff had emergency surgery for the hernia. Human Resources directed Bunce, Plaintiff's new supervisor, that it would be inconsiderate to tell Plaintiff of his lay off while he was on medical leave. Accordingly, when Plaintiff was cleared for work on Friday, December 12 and returned to work on December 15, he was asked to report to Bunce on that day, at which time he was advised of his lay off. With Hinsch's assistance, Bunce explained the reduction in force procedures which had been used and the reason for Plaintiff's selection.

Since his separation from Siemens, Plaintiff has regained employment in his field, *i.e.* telecommunications, and continues to work in this field up to the present time.

## LEGAL ANALYSIS

### I. The Standard of Review

In a motion for summary judgment the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See also* <u>Anderson v. Liberty</u>

Lobby, 477 U.S. 242, 256 (1986)(plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment). Although the moving party has the initial burden of establishing that no factual issues exist, "[o]nce that burden is met, the opposing party must set forth specific facts demonstrating that there is a genuine issue for trial." Sylvestre v. United States, 771 F.Supp. 515, 516 (D.Conn. 1990).

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "In such a situation, there can be `no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 322-23. Accord, Goenaga v. March of Dimes Birth Defects Foundation, 51 F.3d 14, 18 (2d. Cir. 1995)(movant's burden satisfied by showing if it can point to an absence of evidence to support an essential element of nonmoving party's claim). In this regard, mere assertions and conclusions of the party opposing summary judgment are not enough to defend a well-pleaded motion. Lamontagne v. E.I. DuPont de Nemours & Co., 834 F.Supp 576, 580 (D.Conn. 1993), aff'd 41 F.3d 846 (2d Cir. 1994).

The court is mandated to "resolve all ambiguities and draw all inferences in favor of the nonmoving party. . . ." Aldrich

v. Randolph Cent. Sch. Dist., 963 F.2d. 520, 523 (2d Cir.), *cert. denied*, 506 U.S. 965 (1992). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991). If the nonmoving party submits evidence which is "merely colorable", or is not "significantly probative," summary judgment may be granted. Anderson, 477 U.S. at 249-52 (scintilla of evidence in support of plaintiff's position insufficient; there must be evidence from which a jury could reasonably find in his favor). *See also*, Reeves v. Sanderson Plumbing Products, Inc., 120 S.Ct. 2097 (2000).

The Second Circuit has held that summary judgment is appropriate in certain discrimination cases, regardless that such cases may involve state of mind or intent. "The summary judgment rule would be rendered sterile, however, if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion. Indeed, the salutary purposes of summary judgment -- avoiding protracted, expensive and harassing trials -- apply no less to discrimination cases than to commercial or other areas of litigation." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. As to materiality,

11

the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."  Anderson 477 U.S. at 247-48 (emphasis in original).

### II. The Standard As Applied to Disability Under CFEPA

CFEPA Section 46a-60(a)(1) provides that it is discriminatory for "an employer . . . to discharge from employment any individual . . . because of the individual's . . . physical disability . . . ."  "Physically disabled" is, in turn, defined under Section 46a-51(15) as "any individual who has a chronic physical handicap, infirmity or impairment, whether congenital or resulting from bodily injury, organic processes or changes or from illnesses, including, but not limited to, epilepsy, deafness or hearing impairment, or reliance on a wheelchair or other remedial device."  No section of CFEPA defines the term "chronic", nor does the legislative history. "When left undefined, the words of a statute are to be given their commonly approved meaning unless a contrary intent is clearly expressed."  Carothers v. Capozzielo, 215 Conn. 82, 129 (1990).

Accordingly, courts have turned to commonly approved resource materials to define the term "chronic.".  Black's Law Dictionary defines the term to mean "of long duration or characterized by slowly progressive symptoms; deepseated or

obstinate, or threatening a long continuance, disguised from acute." *Black's Law Dictionary* at 241-42 (6th ed. 1990). Several courts have adopted this definition in analyzing claims under the Act. See, e.g., Shaw v. Greenwich Anesthesiology Assoc., 137 F.Supp. 48, 65 (D.Conn. 2001); Gilman Bros. v. Connecticut Commission on Human Rights and Opportunities, 1997 WL 275578 at * 5 (Conn. Super. May 13, 1997). *See also The American Heritage Dictionary of the English Language* (1976) at 240 (chronic defined as of long duration); *Roget's Thesaurus* (4th ed. 1977)(chronic is long lasting; persistent; of long duration; long term).

As Defendant correctly states, "[t]he determination of whether a person is [disabled] should be made at the time of the discriminatory action, and should not be based on the possibility that the employee or applicant will become incapacitated and unqualified in the future." Worthington v. City of New Haven, 1999 WL 95827 at * 9 (D.Conn. Oct.5, 1999), quoting Castellano v. City of New York, 142 F.3d 58, 67 (2d Cir. 1998). The Plaintiff does not disagree with this authority. *See Plaintiff's Memorandum of Law In Opposition to the Defendant's Supplemental Memorandum of Law Regarding its Motion for Summary Judgment (October 3, 2003) at 3.*

Resultingly, Plaintiff must demonstrate that he suffered from a chronic physical handicap, infirmity, or impairment at the

time of his selection for lay-off, October 2, 1997. This he cannot do. Plaintiff completely misconstrues the underpinnings of the mandates of CFEPA when he contends that "[i]f the conditions last for a significant period of time, even after the termination, the fact that they had not fully developed *at the time of termination* does not mean they were not chronic at the time." (emphasis in original). Initially, **the actual time of termination** is not the relevant date pursuant to the authority cited above, with which Plaintiff acknowledged his agreement. In this case, Cyr's analysis of Plaintiff's performance, which analysis led to his termination, was reported to personnel on October 2, 1997. **That is the relevant date for the determination of his disability, if any.** Castellano, 142 F.3d at 67; Worthington, 1999 WL 95827 at * 9.

Secondly, such an untenable proposition would leave employers open for future claims of already-terminated employees ad infinitem. This is in complete contradistinction to the precise language of CFEPA which states that an employer may not **discharge** an employee because of such employee's physical impairment. At all times, this Court is cognizant of the Supreme Court's admonition that "[s]tatutes should be interpreted to avoid . . . unreasonable results whenever possible." American Tobacco Co. v. Patterson, 456 U.S. 63, 71 (1982); *see also* Dougherty v. Carver Federal Savings Bank, 112 F.3d 613, 624 (2d

14

Cir. 1997). Plaintiff's contention would lead to such an unreasonable result under CFEPA.

At the end of the day, Plaintiff had experienced a few recent injuries, placing some minor restrictions on his activities.[4] In fact, although his physician advised him early 1997 that he had a torn meniscus in his knee, which required surgery, Plaintiff put off the surgery until February, 1998 - - eleven months from the date of his accident, four months following the low ratings which, in on October 2,1997, determined that he was to be terminated, and two months after his actual termination.

As for Caruso's back injury suffered during his functional capacity examination on September 10, 1997, his physician described it as merely "a sprain". Missing a few days here and there, Plaintiff continued to work significant overtime for the next few weeks. Currently, he asks this Court to find that his back injury, suffered on September 10, was a "chronic impairment" at the relevant date of October 2, 1997, a mere twenty-three days later. The Court declines the invitation. It is not possible that a twenty-three-day old injury, when Plaintiff had no prior back injuries, became a chronic disability in this minute amount of time. At this early date, even Plaintiff himself could not know that his back sprain, as characterized by his physician,

---

[4] Once he returned full time to work three weeks after he injured his ankle and knee, Plaintiff did not even comply with his physician's restriction to avoid stair climbing. Instead, Plaintiff regularly climbed two stories to work on his job assignment.

15

might possibly continue for an extended time. Most importantly, in his expert report, Plaintiff's own medical expert admits that, as late as December 15, 1997, he had no opinion regarding whether or not Plaintiff's knee and back injury were chronic. *See Exhibit T to Defendant's Motion for Summary Judgment* (Nov. 14, 2001). Accordingly, the Court holds that Plaintiff's back sprain was not a chronic physical disability or impairment at the time of the adverse employment decision.

The Court also holds that Plaintiff's umbilical hernia was not a chronic, disabling impairment at the time the decision to terminate Plaintiff was made on October 2, 1997. As noted above, Plaintiff had de minimus symptoms as to his hernia for three to four weeks prior to its' significant flare-up on November 3, 1997, requiring surgery on November 4, 1997. Plaintiff's Memorandum of Law and exhibits thereto are devoid of any credible evidence that any supervisor, including Cyr, knew that Plaintiff was feeling like "someone was poking his belly button."

In his Memorandum of Law, Plaintiff consistently advises the Court as to his physical status **after** his actual termination on December 15, 1997. "The surgery [on his knee, in February, 1998] may have repaired the torn cartilage, but not fully or completely. To this day, Mr. Caruso has a permanent partial impairment of his knee of 7% related to the injury." Plaintiff fails to state that such permanency rating was not issued until **April 1, 2001.**

The same is true as to the argument made with regard to his back injury. He postulates, "[f]urther, although the effects of the back were present for only a few weeks prior to the termination decision, they lasted for years afterward."[5]/ Again, Plaintiff was not given a permanency rating until April 1, 2001.

Finally, as to his hernia, Plaintiff's affidavit as to Cyr's knowledge of his belly button difficulties is once again in contradistinction to his deposition testimony. Firstly, Plaintiff testified that, for three or four weeks prior to his flare-up and operation, he felt like someone was poking him in the belly button. By three to four weeks prior to November 3, 1997, Cyr had already left the employ of Siemens. Thus, it is not possible for Plaintiff to have discussed this issue with him. Secondly, when asked if he had said anything to Cyr about any medical problems, he testified that the only thing he said to Cyr was, "[k]eep the medical department out of my business at this point." *Plaintiff's Depo.* at 60: L 25 - 61: L 1-3. Further, all of the medical reports submitted to Siemens' medical department from Plaintiff's physician are silent makes no reference to this condition. *See Defendant's Memorandum of Law*, Exhibits Q, R. It is beyond peradventure that Plaintiff cannot establish a *prima facie* case of disability discrimination based on the existence of a condition unknown to Siemens at the time of Plaintiff's

---

[5]/ It must be noted that the medical records attached to Plaintiff's Memorandum of Law show considerable improvement in Plaintiff's back condition by October 20, 1997. See Exhibit 2.

selection for lay-off. See Hedberg v. Indiana Bell Tel. Co., Inc., 47 F.3d 928, 932 (7th Cir. 1995)(holding that "simple logic" indicates that an employer cannot discriminate against an employee because of a disability unless the employer is aware of that disability).

As noted above, CFEPA only prevents **discharge** based on chronic physical disability. Hence, for purposes of CFEPA analysis, Plaintiff's medical condition - - as to his knee, back and hernia - - months and years following his termination is legally irrelevant. See, e.g., Cash v. Smith, 231 F.3d 1301, 1306 n.5 (11th Cir. 2000)(noting that plaintiff's hospitalizations several months after the adverse employment decision could not be considered in determining whether she was disabled).

In summary, Plaintiff has failed to meet his *prima facie* burden that he was a disabled individual, with a chronic medical condition, **at the time of his discharge**. See Conn.Gen.Stat. § 46a-51(15). Defendant's Motion for Summary Judgment must, accordingly, be granted.[6]/

---

[6]/ Inasmuch as the parties have briefed the issue of pretextual termination, the Court will address it short form. Plaintiff asserts that he "can prove that his disabilities substantially contributed to the low rating Cyr gave him on the skills analysis and that therefore the reasons Siemens gave for his termination were pretextual." If Plaintiff has this proof, which he contends he does, it must be substantively supported in credible form. Plaintiff has presented conclusory allegations and speculation and has misconstrued the reports of Siemens' medical department. It is too late in the day for Plaintiff to claim that "he can" show pretext. The time to do so was in opposition to Defendants' Motion. Plaintiff also contends that the timing of his selection for layoff raises an inference of discrimination. His argument fails. Plaintiff was terminated due to his low scores determined by

## CONCLUSION

Since Plaintiff has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 322-23. Resultingly, on remand, Defendant's Motion for Summary Judgment [Doc. No. 23] is hereby GRANTED. The Clerk is directed to close this case.

SO ORDERED

ELLEN BREE BURNS

SENIOR UNITED STATES DISTRICT JUDGE

Dated at New Haven, Connecticut this 5 day of February, 2004.

---

a meticulous analysis of all of the customer engineers in connection with a **previously scheduled** reduction in force. "It is well established that a reduction in work force is a legitimate, non-discriminatory reason for terminating an employee." Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 201 (2d Cir. 1995). See also Tarshis v. The Reise Organization, 211 F.3d 30, 36 (2d Cir. 2000)(economic reasons for reduction in force that results in an elimination of jobs legitimate, non-discriminatory reason for dismissing an employee); Parchinski v. Outlet Co., 673 F.2d 34 (2d Cir. 1982), cert. den'd, 459 U.S. 1103 (1983)(same).